ATTACHMENT A

Case 4:20-cv-00070-RM   Document 11-1   Filed 06/17/20   Page 1 of 19

IN ARBITRATION BEFORE
MICHAEL E. CAVANAUGH, J.D.

| | |
|---|---|
| DEPARTMENT OF CORRECTIONS, State of Washington,<br><br>           Employer,<br><br>and<br><br>TEAMSTERS DRIVER, SALES, and WAREHOUSE LOCAL UNION NO. 117,<br><br>           Union.<br><br>(Gina Cone Discharge Grievance) | ARBITRATOR'S<br>DECISION AND AWARD<br><br>FMCS No. 101527-02843-6 |

**For the Union:**

Spencer Nathan Thal, General Counsel
James V. Smith, II, Staff Attorney
Teamsters Local 117
14675 Interurban Avenue, Suite 307
Tukwila, WA 98168

**For the Employer:**

David J. Slown, Assistant Attorney General
7141 Cleanwater Drive SW
PO Box 40145
Olympia, WA 98504-0145

I.     INTRODUCTION

The Department discharged Grievant Gina Cone, a correctional officer ("CO") at the Department's Stafford Creek Correctional Facility, for failing to maintain proper boundaries with inmates. Allegedly, Ms. Cone spent excessive amounts of time with Inmate Schawn Cruze and also shared too much personal information with him, leading her to be sufficiently "compromised" that she was no longer capable of performing effectively as a CO. There were

also allegations that CO Cone inappropriately sat at inmate tables, was "overly friendly," and acted "flirtatiously," which was not only inappropriate, but made the inmates uncomfortable.

The Union argues on Grievant's behalf that the investigation into the allegations[1] was poorly conducted by a novice investigator and was not properly documented. Moreover, says the Union, the Department's conclusions were largely based on hearsay and double hearsay from unreliable sources, principally inmates—a problem that was compounded when the inmates themselves were not called to testify at the hearing. Consequently, argues the Union, CO Cone was denied a reasonable opportunity to contest their factual allegations. The Union also contends that Inmate Cruze is a devious and methodical inmate who had a history of attempting to compromise female CO's. Moreover, asserts the Union, much of the personal information Cruze had gathered with respect to Ms. Cone could easily have been acquired by overhearing conversations between staff, rather than from direct disclosures by Cone herself, or from articles in the local newspaper about CO Cone's family, or even on social networking sites accessed by friends or family of Inmate Cruze on the outside at his behest. In any event, the Union contends, the proof does not support the summary termination of a ten-year CO with no prior discipline, as opposed to some less drastic approach such as requiring her to undergo retraining and/or transferring her to a different institution.

At a hearing held at the Stafford Creek facility on January 11 and 12, 2012, the parties had full opportunity to present evidence and argument, including the opportunity to cross

---

[1] There were originally 18 allegations, including several that involved sexual contact between CO Cone and inmates. In fact, the investigation began when Inmate Cruze complained to a counselor that he had been raped by CO Cone, a violation of the Prison Rape Elimination Act ("PREA") that would call for summary termination. In the end, however, the Department did not rely on those more serious allegations in determining that Grievant should be discharged, only the three allegations of being overly familiar with inmates and excessively sharing personal information.

examine those witnesses who testified in person.[2] The proceedings were transcribed by a certified court reporter, and I have carefully reviewed the transcript in the course of my analysis of the evidence. Counsel chose to file written post-hearing briefs, which were submitted electronically on March 9, 2012, and with my receipt of the briefs, the record closed. Having carefully considered the evidence and argument in its entirety, I am now prepared to render the following Decision and Award.

## II.   STATEMENT OF THE ISSUE

The parties stipulated that the issue before me should be stated as follows:

> Did the Employer have just cause to terminate the Grievant, Gina Cone? If not, what is the appropriate remedy?

Tr. at 5.

## III.   FACTS

The Department's investigative file runs approximately 400 pages, but much of it deals with the fifteen allegations that were found to be unsupported by reliable evidence, chiefly inmate statements, and thus those aspects of the report need not be examined here in detail.[3] CO Cone had been employed at Stafford Creek for ten years at the time of her termination, and it is undisputed that she had never previously been disciplined. Her supervisor, Sgt. Lane, considered her a good correctional officer. For a number of years, Ms. Cone worked graveyard as a sick

---

[2] As noted, however, the Union objected to my consideration of hearsay evidence contained in the investigatory file given the inability to cross examine those who were not called to the stand at the hearing. I denied the Union's Motion in Limine, but indicated that the weight I should accord hearsay evidence contained in the file and in the investigator's testimony would be an appropriate subject to cover in the parties' post hearing briefs. That is, evidence of the investigation is properly admitted at the hearing because it establishes the extent to which the Department conducted a full and fair investigation, an element of due process in any disciplinary proceeding. Whether the evidence uncovered as part of that investigation is sufficient to establish the wrongdoing upon which the discipline was based, however, is an entirely separate question. While I generally consider hearsay evidence in determining whether an Employer has met its burden of proof, it would be an unusual case in which I could find that the Employer's burden has been met with hearsay evidence alone, and with respect to any specific factual matter, the closer an issue comes to the crux of the case, the less likely I am to be convinced by indirect evidence.

[3] Some of those allegations, at least in outline form, may be helpful in providing context, however, for the three issues on which Superintendent Glebe relied in determining that CO Cone should be discharged.

leave replacement, which resulted in her working in many different areas of the facility. She then was assigned to Master Control,[4] where she worked with CO Harder. They both successfully applied for day-shift openings in one of the residential units and began working in H2 in February 2010. Among CO Cone's duties in H2 was to supervise the "porters," inmates with housekeeping and cleaning responsibilities within the unit. The "foyer porter" was Schawn Cruze, a "three strikes" lifer inmate friendly with the Native American group in the facility, and also a representative elected by the inmates to facilitate the raising of inmate issues with the administration. Cruze was recognized as being a "manipulative" offender, and he had a history of "compromising" female CO's at other institutions.[5]

Within a few weeks after CO Cone began her H2 assignment, co-workers noticed that Inmate Cruze spent a lot of time at her station. For example, CO Harder noticed "he spent a lot of time in the officer's station when she was working." Tr. at 65. Harder thought the amount of time was "unusual," although he saw nothing that he would have described at that time as "inappropriate" other than "the length of time." Tr. at 68-69.[6] Similarly, Sgt. Lane spoke with her

---

[4] Co's in Master Control monitor the security cameras and open and close gates within the facility.

[5] Sgt. Ronny Matsen, CO Cone's Union rep throughout the process, testified that while employed at the Clallam Bay Correctional Facility, he had personally investigated Cruze's compromising of a female CO, Elizabeth Bare, when he was incarcerated there. Bare had been corresponding with Cruze via an assumed name and a mailbox, and apparently had provided him with contraband in the facility such as pornography and perhaps marijuana. Tr. at 235. Although Sgt. Matsen could not testify as to any details, he also indicated that he had been told during the investigation by Department personnel at the Washington State Penitentiary ("WSP") that Cruze had also compromised a female CO while an inmate at WSP.

[6] During the investigation, some witnesses estimated that Cruze and CO Cone spent "from 1 to 6 hours per day" together. CO Cone, while conceding that she spent more time with Cruze than with other inmates, notes that he was a porter that she was required to supervise, one aspect of which was to accompany him to storerooms to retrieve his cleaning supplies. Nevertheless, it would not be possible in light of her daily duties, she testified, to spend as much time with Cruze as some witnesses and the investigator alleged. In addition, she asserts that Cruze was often a talkative inmate who had to be "shooed away" by others, including CO Harder and another CO nicknamed "Ski." Apparently, Cruze and Ski both liked the television show "Survivor," and they often discussed the show at length. Thus, Grievant asserts that she was not the only CO who spent a lot of time talking with Cruze.

on approximately April 14 about what he considered "too much interaction between [Cruze] and Officer Cone." Tr. at 105. Sgt. Lane testified that

> it appeared that a number of times I would come into the pod, he's there. And because of that and other staff made comments he had been there a lot, that I felt that he was spending too much time at the officer's station.

*Id.* Sgt. Lane made clear to CO Cone that he was concerned about "appearances," i.e. "it gives the perception that other things could be going on. I told her that I didn't want anything to come back on her or anything like that, to make sure that—to keep it on a professional basis." Tr. 106. Grievant said she understood and would take care of the issue, and later Sgt. Lane "noticed there seemed to be some hostility between the two of them." Tr. At 111.[7]

At the end of May 2010, just before Memorial Day, Offender Cruze had asked for boxes to pack up the belongings in his cell. CO Cone testified that she understood Cruze had expectations of being released from prison because his lawyers thought they might be successful in challenging one of his three strikes. She told Cruze, however, that he was a lifer who would not be going anywhere, and this comment caused Cruze to become extremely upset with her. The next Tuesday, when Ms. Cone returned to work following the Memorial Day weekend, Cruze angrily threw a handwritten note on her desk:

> I know you said I should unpack my stuff because you would do what I asked but as you can see by my stuff staying packed I think you're a liar. I think you are too scandalous, and today we'll see if I, for once, am right. You have given me thousands of reasons to have you fired, try giving me some not to.

---

[7] CO Cone testified that Cruze got angry anytime she did not do exactly what he asked her to do, and that when she told him to get back to work or that she did not have time to do what he wanted right then, he consistently flew into a rage. Thus, if Sgt. Lane observed "hostility" between CO Cone and Inmate Cruze, one source could have been Grievant's following of his advice to keep a professional distance from the inmate. On the other hand, the Department contends that Cone's co-workers did not observe a change in the generally friendly relationship between Cruze and Ms. Cone until the last week or two prior to the events that led to the transfer of CO Cone out of the unit.

Exh. A-1; Tr. 59. Cruze then immediately went to the counselor's office and claimed that he had had sexual contact with CO Cone on several occasions. Sexual contact with an inmate would constitute a serious violation of PREA and subject a CO to immediate termination.[8] As a result of the complaint, Cruze was sent to the infirmary for a physical evaluation,[9] and CO Cone was reassigned to the mail room away from inmate contact.

While the investigation was underway, CO Cone disclosed that she had found a document left on her mailroom desk in an envelope. Inmate Cruze, who by that time had been transferred to Clallam Bay as a result of an attempt to solicit information about Grievant from another CO, Cone's ex-boyfriend, Tr. 159, told the investigator that the document was one page of a multi-page letter he had written to CO Cone a couple of months earlier. The document tended to incriminate Grievant in some respects. For example, Cruze wrote

> You have entrusted me with so much, you have opened up and let me in and I went and really fucked up. I know the kind of pain you have suffered, all the hardships you have endured and you deserve a man that you can trust to love you, make you happy, and not hurt you so heartlessly like the way I did today.

Exh. A-2.[10] The Department argues that CO Cone deliberately produced only part of a prior letter to her from Cruze "in a fashion calculated to appear mysterious," Department Brief at 7,

---

[8] CO Cone adamantly denied the allegation of sexual contact, and notes that she had recently "infracted" three members the Native American group because she found them tattooing in a cell (both tattooing and being three in a cell were violations). She suggests that her actions in enforcing the rules against his friends played a part in motivating Cruze to retaliate against her by inventing allegations of misconduct.

[9] Within a day or two, however, Cruze was returned to H2, before the investigation into his allegations had been completed. The Union argues that his return to the unit tainted the investigation because it gave Cruze an opportunity to influence the statements that other inmates ultimately gave to the investigator. As an aside, during the investigation, CO Cone told the investigators that she had been told that Cruze bragged to a specific nurse in the infirmary that he had made the whole thing up about having sexual relations with Cone, but that the investigators were "running with it." The investigators did not follow up on this information, which the Union argues is an instance of failing to fully investigate the issues. On the other hand, in attempting to establish just cause for discharge, the Department does not rely on any allegation that CO Cone and Cruze had sexual contact.

[10] Cruze told the investigator that he had made a hurtful remark to CO Cone, essentially taking the side of her ex-boyfriend following their traumatic break-up.

but that the circumstances are "consistent with an attempt by Ms. Cone to confuse the investigation." *Id.* On the other hand, as Investigator Wayman himself noted, it is difficult to understand why CO Cone would voluntarily produce the letter in an attempt to confuse the investigator when it strongly suggests that she had an inappropriately close relationship with Cruze, the very issue on which she was being investigated at the time.

In any event, as a result of the investigation, the Department determined that CO Cone had spent too much time with Inmate Cruze, had shared numerous details of her personal life with him, and had a practice of inappropriately sitting at inmate tables. With respect to the first alleged violation, CO Cone responded that it is not possible, given the course and scope of her duties during the day, that she could have spent as much time with Cruze as alleged. In addition, she claimed that she had unsuccessfully asked her supervisors to remove Cruze from the unit because he would not leave her alone, i.e. would not leave the officer's station when she told him to do so.[11] As noted, she also contends that she was *required* to spend more time with Cruze than with other inmates because he was a porter.

On the sitting at the inmates' tables issue, CO Cone testified that most of the time when she did so it was to go over paperwork with new inmates, many of whom were too short to deal with comfortably from the tall officer's station. She also stated that she sometimes sat at inmate tables in an attempt to monitor their activities, particularly when she suspected gambling. Because gambling exchanges occurred under the table, she believed it was important to be at table level to detect it, and she would feign an interest in learning the game being played in order to be in a position to determine what the inmates were doing.

---

[11] Both Sgt. Lane and Custody Unit Supervisor Grubb denied that CO Cone had ever requested that Cruze be removed, and they denied telling her that an inmate could not be removed absent some serious infraction.

But the most serious allegation against Officer Cone is that she compromised herself by disclosing personal information to Inmate Cruze. The information she allegedly disclosed included her middle name ("Michelle"),[12] her daughters' names (including nicknames) and birthdates, the cars her daughters drove, the fact that one daughter was a foster daughter, not her biological daughter, the schools attended by her daughters, her address, that she has a turtle tattoo on her lower back, a description of a necklace she wore inside her uniform, and personal financial information related to how much money she needed to avoid foreclosure on her home. Exh. A at 3-4. During the investigation, CO Cone pointed out that some of the alleged "knowledge" she had allegedly disclosed to Cruze was erroneous,[13] some was easily ascertainable from the local newspaper because her daughters were engaged in sports and other activities,[14] and some information could have been gathered in overheard conversations between officers within earshot of Cruze or one or more of his friends.[15] Moreover, some inmates were known to be able to read lips so that information could be gleaned from such conversations even if they were not close enough to hear the words spoken. Moreover, she contends, as a porter,

---

[12] The "Michelle" issue had potential importance beyond disclosure of CO Cone's personal information. The investigator listened to recordings of some of Cruze's telephone conversations with his family, in at least one of which he said he had a new girlfriend named "Michelle." That conversation led the investigator to consider whether the "Michelle" in question was actually CO Cone.

[13] For example, Cruze misidentified the biological father of Ms. Cone's foster daughter as Tom Rasmussen, whereas it was actually Rasmussen's brother, a former inmate. Similarly, Cruze contended that CO Cone had surgery on her upper back or neck because of some form of cancer, but Cone showed the investigators that she had no corresponding surgical scars. In addition, Cruze had stated CO Cone needed a certain amount of money to save her home from foreclosure, but the amounts stated were wildly inaccurate according to Cone. Also, Cruze claimed that one of Cone's daughters had been involved in a serious auto accident, but there is no evidence that such an accident ever occurred.

[14] CO Cone's daughters also had Facebook pages, which were apparently set to "open," from which much of the personal information about them was easily accessible. Although Inmate Cruze might not have been able to access Facebook directly, it is possible, says the Union, that he could have had someone on the outside access the information for him.

[15] For example, with respect to her tattoo, which Cruze did not claim to have actually seen, CO Cone testified that she had spoken with CO Fleming, who does tattooing, about having some ornamentation added to her turtle tattoo.

Cruze had more access to areas where such conversations might be overheard than most inmates.[16] At the same time, however, CO Cone admitted that she had disclosed at least some personal information to Cruze, including her middle name.[17]

In the end, Superintendent Glebe reasoned that CO Cone had volunteered more information to Cruze than she let on. In reaching that conclusion, it was important to the Superintendent that Cone's fellow officers, with whom she said she had discussed some of the personal information Cruze possessed, told the investigators that they were unaware of that information. The Superintendent believed that fact undermined CO Cone's assertion that inmates could have learned the details of her personal affairs by overhearing staff discussions:

> While an offender overhearing staff talking amongst themselves is possible, I do not believe that the extent and detail of the personal information offender Schawn C. possesses about you and your family could possibly be learned without it having been conveyed directly to the offender. . . . The fact that you shared information about your family, finances, and personal photos with an offender resulted in a compromise of security for you, your family, your co-workers, and other offenders.

Exh. A at 4(Termination Letter dated December 15, 2010). Superintendent Glebe concluded that CO Cone had been "intentionally dishonest about [her] dealings with [Cruze]," and he observed that "I have lost trust in your ability to perform the duties of a CO2 due to your dishonesty, your inability to credibly answer questions concerning how the offender obtained such detailed personal information about you, and your unwillingness to accept responsibility for your behavior." *Id.* at 6.

---

[16] Sgt. Matsen testified to knowledge of an inmate at Clallam Bay who had gathered 300 pages of similar information on officers in precisely that manner. Tr. at 264-66.

[17] According to Ms. Cone, Cruze got off the phone and complained about his girlfriend named "Michelle" who supposedly worked in the Governor's office. Grievant then said something like "anybody with that name has to be cool . . . because that's my middle name." Tr. at 322. As an aside, the Department never investigated whether there was someone employed in the Governor's office named Michelle and, if so, whether she knew Inmate Cruze.

The Union filed a timely grievance on behalf of CO Cone which the parties were unable to resolve in the preliminary steps of their grievance and arbitration procedure. These proceedings followed.

## IV.   DECISION

A. Quantum and Burden of Proof

The allegations against CO Cone are serious, and as an employee with substantial seniority and a record that reflects no prior discipline, it is appropriate that the Department bear the burden of proof as to the allegations on which her discharge was based by more than the barest preponderance of the evidence. That is so because a discharge under these circumstances not only means the end of Ms. Cone's career with the Department, it almost certainly means the end of her career *anywhere* in corrections. Under those circumstances, principles of just cause require convincing evidence of serious misconduct, and they also require the Department to establish, consistent with widely accepted notions of progressive discipline inherent in just cause, that CO Cone was not salvageable as an effective corrections officer. In other words, even if she has failed to meet the Department's expectations in one or more important ways here, I must nevertheless examine whether a disciplinary penalty short of discharge could reasonably have been expected to result in the changes to her performance necessary to meet DOC's standards.

B. The Merits

The heart of the Department's case is contained on the last page of Superintendent Glebe's termination letter, i.e. he had lost trust in CO Cone because she was unable to credibly explain how Cruze could have obtained personal information about her without that information having been provided directly by Ms. Cone. In addition, the Superintendent cited her

"unwillingness to accept responsibility" for her behavior. Exh. A at 6.[18] I agree that CO Cone shared too much information with Cruze and that it is highly unlikely that he gained *all* of the information about her from overheard conversations between officers (or reading their lips) or in the local newspaper. I also agree that Ms. Cone seems resistant to the idea that she must accept responsibility for her behavior. At the same time, I think it is inaccurate to state that she is completely insensitive to that requirement—for example, she readily conceded in her testimony that she had disclosed her middle name to Inmate Cruze.[19] She also admitted that she sat at inmate tables, but offered plausible legitimate reasons to do so.

At the end of the day, however, Superintendent Glebe simply did not believe CO Cone's explanations of how Cruze could have acquired personal knowledge about her and her family. While I would not say that the Superintendent's doubts were unreasonable, doubts and suspicions—even reasonable ones—simply are not proof, let alone "convincing" proof. The Department has not refuted Ms. Cone's testimony that there had been articles about her daughters in the local paper—one daughter played softball and the other was a cheerleader. Several witnesses testified that staff often talked with each other about personal matters, even in

---

[18] The other alleged violations, i.e. spending too much time with Cruze and sitting at inmate tables, even if true, strike me as the types of indiscretions that are amenable to re-training—or at the very least, to rehabilitation through a course of progressive discipline. For example, while Ms. Cone had been informally counseled on that subject, she had not been disciplined. I have no reason to believe that had the seriousness of these issues been brought to her attention through a written warning, for example, that she would have been incapable of responding positively. Similarly, if the Department believed that CO Cone inappropriately sat at inmate tables, despite her plausible explanations of why she did so, there is little reason in this record to presume that she was incapable of altering her behavior once she fully understood the nature of the Department's concerns. To the extent the Department relies on an allegation that CO Cone was "overly friendly" or "flirtatious" while sitting at the tables, the supporting evidence is thin. Most, if not all, of that evidence is hearsay from inmates, an evidentiary source that must be viewed with considerable skepticism. CO Harder, on the other hand, testified that he had never personally seen CO Cone being "flirtatious." Tr. at 84. In sum, these two allegations either lack sufficient supporting evidence and/or are the kinds of performance issues that could be expected to improve following notice and discipline short of summary termination.

[19] While the Union has argued, at least implicitly, that a CO's middle name is available to the inmates under some circumstances—e.g. in discovery when the CO is made a party to an inmate lawsuit—the circumstances here, taking CO Cone at her word, are quite different.

areas where inmates might be able overhear. There was also evidence that CO Cone's personal life became a particular subject of gossip within the institution when she had a messy break-up with a boyfriend who was a co-employee at Stafford Creek[20] and also following Inmate Cruze's allegations against her. These factors suggest that Cruze might have gathered much of his information not from Ms. Cone herself, but rather from overheard staff conversations and the rumor mill within the facility.

In evaluating the likely sources of the information possessed by Inmate Cruze, it is also significant to me that some of that "information" was demonstrably in error, e.g. Ms. Cone's supposed cancer surgery, the amount of money she needed to save her home, and that her daughter allegedly had been involved in a serious auto accident. That suggests to me that Cruze must have been relying on sources other than Ms. Cone for those specific alleged facts, and it would be reasonable to assume that the same might well be true of much of the information that happened to be true. I also note that the investigator did not follow up on sources that could have explained how Cruze might have received some of his information from sources other than Ms. Cone, (e.g., the investigator did not ask CO Fleming if he and CO Cone had engaged in workplace discussions about having tattoo work done on her turtle) or that might have undermined the investigator's suspicion that "Michelle" was in fact CO Cone (e.g. the investigator did not attempt to confirm or to refute CO Cone's allegation that Cruze claimed to have a girlfriend named "Michelle," said to be an employee in the Governor's office).[21]

---

[20] In fact, the evidence established that a court had issued a no-contact order, which created difficulties for the institution because CO Cone and her ex were sometimes scheduled to work at the same time.

[21] In addition, it is undisputed that the investigator did not follow up on Ms. Cone's assertion that Cruze had told at least one nurse in the infirmary that he had made up his allegations, but the Department was "running with them."

In sum, I do not believe that the Department has convincingly established that *all* of the personal information Cruze possessed came from CO Cone herself. But as an aside, even if it had, it is unclear to me that those circumstances would justify summary termination of a ten year employee with a good record. Certainly, had the allegations of sexual contact between Ms. Cone and the inmate been established, or that she had provided contraband to him, there could be little doubt that the Department would have just cause to discharge CO Cone despite the length of her career and the lack of prior discipline. But in the absence of such aggravating circumstances, all of the alleged offenses appear to me to be the kind of performance issues that could reasonably be expected to improve by imposing a lesser form of discipline and offering Ms. Cone an opportunity going forward to demonstrate her ability to comply with the Department's reasonable expectation that a CO not cross professional boundaries with inmates.

The termination letter suggests to me that the Superintendent reached a different conclusion primarily because of CO Cone's alleged "dishonesty" in responding to the charges against her. Exh. A at 6.[22] But the Superintendent's conclusion appears to be based on a determination that the specific allegations against CO Cone contained in the discharge letter had been established by consistent and credible evidence, and for reasons set forth above, I cannot find that to be the case. Moreover, if CO Cone had been attempting to be entirely deceptive in responding to those allegations, I fail to understand why she would admit some of them, such as disclosing her middle name to Cruze. Similarly, I do not understand why CO Cone would voluntarily turn over to the Department two letters purportedly written to her by Inmate Cruze. The second letter in particular was potentially highly damaging to her defense against the

---

[22] Superintendent Glebe made clear that he did not terminate Ms. Cone for dishonesty *per se*, but rather that his conclusion that she had been dishonest had affected his assessment of whether she could be effectively "rehabilitated" as a correctional officer. Tr. at 220.

charges. The Department's theory about her motive—that she was attempting to "confuse" the investigation—strikes me as implausible. It was certainly a "high stakes" attempt at confusion if that was the case, because the second letter on its face appears consistent with the allegation that CO Cone had an intense emotional relationship, at the very least, with Inmate Cruze.[23]

In sum, I do not find the kind of thoroughly convincing evidence that would be required for me to conclude that Ms. Cone was deliberately dishonest during the Department's investigation or during her testimony at the hearing before me. On the other hand, she appears to me not to have fully accepted that she crossed boundaries with Cruze—or at the very least gave the appearance of doing so—despite having been warned by Sgt. Lane shortly after transferring to H2. And when I gave her the opportunity at the end of her testimony to tell me how she thought things would work out if she were to be reinstated, she launched into an extended recitation of several ways in which the Superintendent had been unfair to her, but said there would not be any issues if she were reinstated, especially to the graveyard shift, because "I don't go out of my way to talk to him." Tr. at 346.[24]

In the end, I find that CO Cone very likely disclosed personal information to Cruze beyond the off-hand reference to her middle name. I also find that she failed to manage her

---

[23] The Department also questions Ms. Cone's credibility in connection with her claim that she discovered the second letter on her mailroom desk when she returned from lunch. While I do not find it necessary to resolve the "mystery" conclusively, I note the testimony of Sgt. Sullivan, head of the mailroom, that if someone had placed something to CO Cone in the internal mail so that it ended up in a different destination, the person who received it might have walked it over to D Building and placed it on Cone's desk. Tr. at 124. Thus, the fact that none of the mailroom employees delivered the envelope or knew how it arrived on Ms. Cone's desk is not conclusive evidence that Ms. Cone herself must have put it there. Even if Cruze could not have put the letter in the internal mail (because he had been transferred to Clallam Bay), it is not beyond the realm of possibility that one of his inmate friends did so on his behalf, and/or that one of the inmates she had "infracted" had reason to do so.

[24] Frankly, I had hoped Ms. Cone would say, without necessarily accepting full responsibility, that she had learned an important lesson that would not be forgotten if she were reinstated, or at the very least that she recognized the need to reestablish the Superintendent's trust and confidence in her ability to maintain professional interactions with inmates.

professional relationship with Inmate Cruze so as to maintain the *appearance*, as well as the fact, of appropriate professional boundaries—and that she failed to do so despite an explicit warning from Sgt. Lane that she appeared not to be maintaining an appropriate distance from Cruze. Her practice of sitting with inmates at tables also created an "appearance" issue. But the record does not convince me that CO Cone crossed so far over the line as to be no longer salvageable as an effective correctional officer. She may have lacked sufficient self-awareness to fully accept a proper share of personal responsibility for her situation, but I cannot say that it is too late for her to alter her workplace behavior and to demonstrate that she can consistently maintain appropriate professional boundaries. Thus, I cannot find that the Department has convincingly established just cause for summary discharge. The Department did have just cause, however, to impose a one-week disciplinary suspension without pay.[25]

It follows that CO Cone must be reinstated and be made whole. If the Department believes it to be appropriate, she may be required to undergo a reasonable course of retraining on appropriate interactions with inmates. Two issues remain, however. First, given that Ms. Cone's actions gave rise to an appearance of failing to maintain proper boundaries, thus potentially undermining her authority with inmates and the respect of her supervisors and fellow officers, I will not require that the Department reinstate her to Stafford Creek. Rather, if the Department chooses, it may reinstate her instead to one of the two DOC institutions geographically closest to

---

[25] The record is silent on the kinds of disciplinary penalties imposed by the Department under circumstances in which a correctional officer, while failing to live up to professional standards, has not been so deficient in his or her performance as to justify immediate termination. Thus, as Arbitrator, I can only make my own judgment about the appropriate penalty under those circumstances, relying on my sense of what other Employers usually do in similar situations.

Stafford Creek[26] or to any other Department institution as mutually agreed between the Department and the Union.

Second, the Union has requested that make-whole relief include interest on back pay. I recognize that a number of arbitrators in recent years have awarded interest as part of a make whole remedy, and I concede that there is logic to support that approach. I note, however, that interest is not "traditionally" awarded on sums an arbitrator finds owing. *See*, e.g. St. Antoine, *The Common Law of the Workplace* at § 10.35 (2d Ed., BNA, 2005); *see also*, Ruben, ed., *Elkouri & Elkouri's How Arbitration Works* at 1218-21 (6th Ed., BNA, 2003). This traditional rule may well lack reasoned support in the context of a "make whole" remedy, as the Union urges, but many of the accepted "rules" of labor relations may seem anachronistic or unreasonable when analyzed without reference to history and custom. Most importantly, however, whether the traditional "no interest" rule is fair and reasonable or not, labor relations professionals still typically assume that interest will not be available on back pay.[27] Therefore, whatever the logical force of the Union's arguments, I find that it would undermine the reasonable bargaining expectations of the parties to award interest in the absence of a statute or a contractual agreement on the subject.[28]

In an appropriate case, of course—for example, a party's "bad faith," frivolous justifications for its actions, or an unjustified delay in complying with an arbitrator's remedial orders—interest may well be justified even though not "traditional" or "customary." I do not find

---

[26] I understand the two closest facilities to be Cedar Creek and Shelton. Tr. at 348.

[27] Although admittedly not based on a scientific sample, my own experience over the last 15 years as a neutral is that unions rarely request interest on back pay. I infer from that fact that even among union-side advocates, there is wide acceptance of the "traditional rule," or at least an expectation that the traditional rule still holds sway.

[28] In its brief, the Union has not pointed to any statute or specific contractual language in support of its claim for interest on back pay.

the Department's position here, however, to have been frivolous or in bad faith, nor do I anticipate any resistance to implementation of my remedial award.[29]

## V. CONCLUSION

For the reasons set forth above, I find that the Department did not have just cause for the summary discharge of Grievant Gina Cone, but did have just cause to impose a one-week disciplinary suspension without pay. Therefore, Ms. Cone shall be promptly reinstated without loss of seniority or benefits, and she shall be compensated for lost wages beyond the period of suspension. Interest on back pay will not be awarded. In light of Ms. Cone's failure to maintain appropriate inmate boundaries at Stafford Creek, the Department may choose not to reinstate Ms. Cone to her former facility, but rather to one of the two geographically closest Department correctional facilities instead (or to any other Department facility as mutually agreed between the Department and the Union).

---

[29] In fact, when I wondered aloud whether Ms. Cone and Superintendent Glebe could work productively together should I order reinstatement, the Superintendent volunteered that he did not take such issues personally. Tr. At 348

## **AWARD**

Having carefully considered the evidence and argument in its entirety, I hereby render the following AWARD:

1. The Department did not have just cause for the summary discharge of Grievant Gina Cone, but did have just cause to impose a one-week disciplinary suspension without pay; therefore,

2. Ms. Cone shall be promptly reinstated without loss of seniority or benefits, and she shall be compensated for lost wages beyond the period of suspension; interest on back pay is not awarded;

3. In light of Ms. Cone's failure to maintain appropriate inmate boundaries at Stafford Creek, the Department may choose not to reinstate Ms. Cone to her former facility, but rather to one of the two geographically closest Department correctional facilities instead (or to any other Department facility as mutually agreed between the Department and the Union); if the Department believes it to be appropriate, Grievant may be required to undergo a reasonable course of retraining on appropriate interaction with inmates; and

4. The Arbitrator will retain jurisdiction for the sole purpose of resolving any disputes over implementation of the remedy awarded that the parties are unable to resolve on their own; either party may invoke this reserved jurisdiction by fax or email sent, or letter postmarked, within sixty (60) days of the date of this AWARD (original to the Arbitrator, copy to the other party) or within such reasonable extensions as the parties may mutually agree (with prompt notice to the Arbitrator) or that the Arbitrator may order for good cause shown; and

5. Consistent with the terms of their Agreement, the parties shall bear the fees and expenses of the Arbitrator in equal proportion.

Dated this 28th day of March, 2012

*[signature]*

Michael E. Cavanaugh, J.D.
Arbitrator