SKC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Jeremy Pinson, | No. CV 20-00070-TUC-RM |
| Plaintiff, | |
| v. | **ORDER** |
| United States of America, | |
| Defendant. | |

Plaintiff Jeremy Pinson, who is currently confined in the United States Penitentiary ("USP")-Tucson, brought this civil rights action pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Federal Tort Claims Act ("FTCA"), and the Privacy Act.  (Doc. 15.)  Defendant United States of America moves for summary judgment on Plaintiff's remaining FTCA claims.  (Doc. 99.)  Plaintiff was informed of her[1] rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 103), and she opposes the Motion (Doc. 119). Defendant filed both a Reply and a Reply in Support of Statement of Facts.  (Doc. 122, 123.)[2]

For the following reasons, the Court will grant the Motion for Summary Judgment.

. . . .

---

[1] Plaintiff is transgender and uses feminine pronouns.

[2] Defendant's Reply in Support of Statement of Facts violates Local Rule of Civil Procedure 56.1(b), which states that "no reply statement of facts may be filed." Accordingly, Defendant's Reply in Support of Statement of Facts will not be considered.

## I. Background

On screening of Plaintiff's three-count First Amended Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated FTCA claims against Defendant United States of America in Counts One and Two and constitutional and Privacy Act claims against Defendants United States of America and USP-Tucson Warden Barbara Von Blanckensee in Count Three. (Doc. 14.) The Court dismissed the remaining claims and Defendants. (*Id.*)

Defendants subsequently moved for summary judgement based on failure to exhaust administrative remedies. (Doc. 34.) The Court granted summary judgment with respect to Plaintiff's claims in Count Three and dismissed those claims and Defendant Von Blanckensee without prejudice for failure to exhaust. (Doc. 47.) The Court denied summary judgment to Defendant United States of America on Plaintiff's FTCA claim based on negligent medical care in Count Two and on the portion of Plaintiff's FTCA claim in Count One alleging failure to protect Plaintiff from an alleged assault on December 16, 2019, finding those claims exhausted. (*Id.* (as amended by Doc. 59).) The Court granted summary judgment to Defendant United States of America with respect to the portion of Count One premised on allegations of staff misconduct that took place after January 12, 2019. (Doc. 59.)

In the remaining portion of Count One, Plaintiff alleges that, on October 2, 2019, during a Prison Rape Elimination Act ("PREA") investigation, Plaintiff told USP-Tucson staff that a violent prisoner, Schawn Cruze, was threatening her. (Doc. 15 at 3.) On October 23, 2019, Plaintiff was placed in the Challenge Program and was doing well until November 27, 2019, when Cruze was placed in the general population and began making death threats against Plaintiff. (*Id.*) Plaintiff spoke to Special Investigative Supervisor ("SIS") Cristinzio about this, and Cristinzio promised to immediately place Cruze in the special housing unit ("SHU") but instead waited two hours, during which time Cruze placed a "contract hit" on Plaintiff with prisoners Seeton, Smith, and Dugard, who owed Cruze money for drugs. (*Id.*) On December 16, 2019, Plaintiff was attacked by Dugard,

and both Plaintiff and Dugard were placed in the SHU until January 14, 2020. (*Id.*) Plaintiff alleges she suffered injuries including a concussion, deviated septum, bleeding, bruising, swelling of the face, and mental and emotional trauma. (*Id.*)

In Count Two, Plaintiff alleges, in relevant part, that after her release from the SHU, she was again assaulted on January 17, 2020, and following her assault, she was released from the hospital in severe pain. (*Id.*) She informed Defendant Schuler while being escorted back to the SHU that the hospital had discharged her with instructions to take pain medication. (*Id.* at 4.) Defendant Schuler yelled and cursed at Plaintiff for requesting pain medication and did not give her any pain medication or access to medical staff. (*Id.*) For two weeks, Plaintiff suffered intense pain and nausea with vomiting due to having a concussion that was left untreated, and she was not seen by a medical doctor for proper follow-up care. (*Id.*)

## II.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact

conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.   Count One**

   **A.   Facts**

From February 15, 2018 through December 4, 2020, Plaintiff was confined in the USP-Tucson. (Doc. 100 (Def.'s Statement of Facts ("DSOF")) ¶ 2.)

   **1.   Plaintiff's PREA Complaint**

On October 2, 2019, Plaintiff submitted a Request for Administrative Remedy in which she alleged that another prisoner was sexually harassing her. (DSOF ¶ 15; Doc. 100-2 at 60.)[3] On October 9, 2019, SIS Lieutenant. T. Herlich interviewed Plaintiff in the SHU as part of an investigation into this complaint, and Plaintiff additionally reported that a different prisoner, Cruze, was trying to impress [redacted][4] and was threatening Plaintiff for filing the PREA complaint. (DSOF ¶ 15; Doc. 100-2 at 61.)

The suspect Plaintiff had accused in the PREA complaint was also interviewed, and he reported that he had been buying Plaintiff's medication from Plaintiff or Plaintiff's

---

[3] Record citations refer to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

[4] Because the investigative report Defendant produced is heavily redacted, it is unclear who Cruze was trying to impress by allegedly threatening Plaintiff. Defendants also set forth other facts and conclusions based on this report, allegedly drawn from excerpts of grievances filed by Plaintiff and others cited therein, that are impossible to verify based on the heavily redacted report. (*See, e.g.* DSOF ¶ 21; Doc. 100-2 at 66.) In any case, other than the fact that Plaintiff reported a threat, the specific details of this investigation are not material to Plaintiff's FTCA claim based on failure to protect after the fact.

1    cellmate and had paid Plaintiff for medication, but Plaintiff refused to turn over the
2    medication and tried to put a "hit" on him. (DSOF ¶¶ 17−20.) Plaintiff denies she ever
3    sold, traded, or gave away her medications or threatened to put a hit on anyone. (Doc. 120
4    (Pl.'s Statement of Facts in Opposition to Def.'s Motion for Summary Judgment ("PSOF"))
5    ¶¶ 17−20.)

6    The investigation concluded that Plaintiff's PREA allegation was unsubstantiated,
7    and the animosity between Plaintiff and the suspect was due to disputes around the sale of
8    Plaintiff's daily medication. (DSOF ¶ 22.) Plaintiff admits that this was the conclusion of
9    the investigation but denies that this finding was accurate. (PSOF ¶ 22.) None of the
10   witnesses' statements from the PREA investigation confirmed that Cruze had threatened
11   Plaintiff. (DSOF ¶ 23.)

### 2. December 16, 2019 Assault

13   On December 15, 2019, Plaintiff went to Lieutenant Eastwood's office to report
14   threats made against Plaintiff by Cruze and another prisoner in connection with Cruze's
15   drug business,[5] and Eastwood brought in SIS Cristinzio, who took down Plaintiff's
16   complaint and told Plaintiff that Cruze would be sent to the SHU. (DSOF ¶¶ 24−25; Doc.
17   100-5, Ex. C. at 5−7 (Pl. Dep. at 42:11−44:12).) Cruze saw Plaintiff coming out of the
18   Lieutenant's office, and an hour later, at 9:21 a.m., Cruze was sent to the SHU. (*Id.*)

19   The next day, December 16, 2019, while Plaintiff was in the dining hall, prisoner
20   Billy Dugard struck Plaintiff with a closed fist. (DSOF ¶ 3.) Afterward, Plaintiff was
21   assessed by RN Schuler for reports that her right ear hurt. (*Id.* ¶ 4; Doc. 105 at 3.) RN
22   Schuler conducted a "head to toe" visual exam and noted Plaintiff's right ear was red with
23   no swelling and that Plaintiff had no other injuries. (Doc. 105 at 5.)[6]

---

[5] Although unclear from Plaintiff's allegations in her Complaint, this report of threats from Cruze appears to involve a new threat, separate from the one Plaintiff reported during the PREA investigation.

[6] Plaintiff appears to dispute that she did not sustain any other injuries, stating she sustained "redness to her ear and an injury to her jaw." (PSOF ¶ 4.) In support, she cites only generally to her three-page declaration (Doc. 120-1 at 1-3), but her declaration does not contain any statements regarding the injuries she sustained on December 16, 2019 and states only that Plaintiff sought pain medication after the separate, January 17, 2020

- 5 -

According to the Incident Report of this assault, Dugard stated that he assaulted Plaintiff because he was having a bad day, his father had passed away a week beforehand, and Plaintiff had been making disrespectful comments toward him; Dugard denied being paid to hit or attack anyone. (DSOF ¶ 5; Doc. 100-2 at 31.) When Plaintiff was interviewed after the assault, she stated that her life and the lives of others were in danger, and a message from prisoner [redacted] came out of the SHU that stated, "500 dollars to hit Jeremy Pinson, or 1,000 to hit all of the following inmates: [redacted]."  (DSOF ¶ 8; Doc. 100-2 at 31.) Two other prisoners reported that the assault was a "paid hit" on Plaintiff for $500.00 sanctioned by a prisoner who believed Plaintiff had told on him and gotten him sent to the SHU. (DSOF ¶ 12; Doc. 100-2 at 33.)  The investigation could only substantiate that animosity existed between Plaintiff and Cruze, and if allowed to program on the same yard, more violence could occur.   (DSOF ¶ 12; Doc. 100-2 at 34.)   Plaintiff provided investigators Calvillo and Espinoza a list of ten prisoners who witnessed the assault, but all ten told Plaintiff they were never interviewed about the incident.  (PSOF ¶ 12; Doc. 120-1 at 1 (Pl. Decl.) ¶ 3.)[7]

On December 22, 2019, during a recorded visit, Plaintiff told a visitor that she had reported to the Lieutenant that a "drug dealer" prisoner who brings Suboxone into the prison was threatening to stab another prisoner; then at 2:00 p.m. on December 16, 2019, Plaintiff learned from a prisoner on the yard during outdoor recreation that the drug dealer prisoner had put a hit on her and three other prisoners. (DSOF ¶ 26.)

On December 25, 2019, Plaintiff sent a letter titled, "Request for Investigation," to the U.S. Department of Justice Office of Internal Affairs ("OIG"), stating she had been

---

incident, which is not relevant to this claim.

[7] Defendants provide additional facts that, in an undated handwritten note, Plaintiff wrote that, on December 15, 2019, Cruze threatened a prisoner in the dining hall and asked him "to tell [redacted] he's going to come into D-2 to assault [redacted] even if he has to attack staff to get to [redacted]." (DSOF ¶ 8; Doc. 100-2 at 36.) It is not clear how, if at all, this undated note relates to any of the material events underlying Plaintiff's FTCA claim, and because it is undated, it is not clear when it was written or received, making it difficult to determine its relevance.

assaulted in the USP-Tucson dining hall on December 16, 2019 due to her providing information to SIS Cristinzio on December 14, 2019 about prisoners [redacted] who were the primary dealers of Suboxone, which they brought into the prison via visitation and the prison mail. (DSOF ¶ 13; Doc. 100-2 at 50.) On January 12, 2020, Plaintiff also submitted a tort claim (SF-95) to the BOP, stating that, on December 14, 2019, [redacted] made threats to stab and kill other prisoners at USP-Tucson, and Plaintiff reported this to Lieutenant Eastwood and SIS Cristinzio, and "staff disclosed to [redacted]" that Plaintiff had "provid[ed] this information resulting in [redacted] sending a note" instructing [redacted] to physically attack Plaintiff. (DSOF ¶ 14; Doc. 100-2 at 54.) Plaintiff claimed that [redacted] then attacked her in the dining hall, causing her "bruising, swelling to skull, severe pain, and emotional suffering." (Doc. 100-2 at 54.)

### 3. BOP Policies Regarding Threat Assessments

Under BOP Program Statement 5270.11, "Special Housing Units," a prisoner may be placed in administrative detention status for protective custody if that prisoner is a victim of assault, is being threatened by other prisoners, is perceived by other prisoners to have provided assistance or information to staff or law enforcement, or if the prisoner refuses to house in the general population due to fears for her own safety. (DSOF ¶ 51; *see* Doc. 100-3 at 61−78.) Whenever a prisoner is placed in protective custody, staff conduct an investigation to verify the need for such placement. (*Id.* ¶ 52.) When determining the validity of an alleged threat and how to respond, staff weigh information from a number of sources and consider a number of factors, such as the source and credibility of the information, the resources available to address credible threats, and the rights of the prisoners in the institution. (*Id.* ¶¶ 56−57.) If the need for protective custody is verified, the prisoner will, at the Warden's discretion, either remain in protective custody or be transferred to another facility where protective custody may not be required. (*Id.* ¶ 53.) If the need for protective custody is not verified, the prisoner will be returned to the general population. (*Id.* ¶ 54.)

. . . .

### B. FTCA Legal Standard

The FTCA waives the sovereign immunity of the United States for certain torts committed by federal employees. 28 U.S.C. §§ 1346(b), 2671-2680; *see F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). But that waiver is limited. *Alfrey v. United States*, 276 F.3d 557, 561 (9th Cir. 2002). "Liability cannot be imposed if the tort claims stem from a federal employee's exercise of a 'discretionary function.'" *Id.* (quoting 28 U.S.C. § 2680(a)); *see Green v. United States*, 630 F.3d 1245, 1249 (9th Cir. 2011) (noting that the United States is immune from suit for claims based on a federal agency or employee's performance or failure to perform a discretionary function, even if the discretion involved is abused).

Courts use a two-part test to determine whether an act or omission falls within the discretionary function exception to the FTCA. *Green*, 630 F.3d at 1249. First, the court must "determine whether a federal statute, regulation, or policy mandated a specific course of action, or whether the government actor retained an element of judgment or choice with respect to carrying out the challenged action." *Id.* (citing *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir.2008)). If the challenged conduct involved an element of choice or judgment, the second step is to determine "'whether that judgment is of the kind that the discretionary function exception was designed to shield, namely, only governmental actions and decisions based on considerations of public policy.'" *Green*, 630 F.3d at 1249 (quoting *Terbush*, 516 F.3d at 1129). "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991). The discretionary function exception is designed to shield "legislative and administrative decisions grounded in social, economic, and political policy[.]'" *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988) (internal quotation marks omitted).

"If the challenged action satisfies both of these two prongs, that action is immune from suit—and federal courts lack subject matter jurisdiction—even if the court thinks the government abused its discretion or made the wrong choice." *Green*, 630 F.3d at 1249-50.

**C.     Discussion**

Defendant argues that the discretionary function exception applies to Plaintiff's FTCA claim because, as to the first prong, no federal statutes, regulations, or policies set out precise steps prison officials must take to ensure the safety of a prisoner. (Doc. 99 at 9.)  As to the second prong, Defendant argues that, to the extent Plaintiff can show prison officials knew of a threat posed by prisoner Cruze based on Plaintiff's allegations during the October 2019 PREA investigation or during her December 2019 conversation with SIS Cristinzio, prison staff are entitled to a strong presumption that the actions they took in response were grounded in public policy. (*Id.* at 11.)

**1.     Whether Federal Statute, Regulation, or Policy Mandated Specific Protective Actions**

The BOP is required by federal statute to protect prisoners in its custody. Under 18 U.S.C. § 4042(a), it must "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States," and it must "provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(1) & (2). But, while this statute sets forth a mandatory duty of care, it does not "direct the manner by which the BOP must fulfill this duty." *Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997) ("The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates").

Applicable federal regulations and BOP policy governing protective housing, such as the SHU, are no different. Under 28 C.F.R. § 541.27, a prisoner "may be placed in administrative detention status" for protection under the following circumstances: if (a) the prisoner is the "victim of inmate assaults or threats," (b) the prisoner is an "inmate informant" whose safety is threatened, (c) the prisoner refuses to house in the general population, or (d) staff believe the prisoner's safety is threatened in the general population. 28 C.F.R. § 541.27. Program Statement 5270.11, as already set forth above, mirrors these regulations, enumerating the same four factors for when a prisoner "may" be placed in the

SHU under § 541.27.  (DSOF ¶¶ 51−57; Doc. 100-3 at 68.)  Like 18 U.S.C. § 4042(a), these regulations and policy provisions give prison staff discretion to determine when protective housing is required, stating only that a prisoner "may" be placed in administrative detention status for protection under certain enumerated situations, one of which is prison staff's "belief" that the prisoner's safety is at risk.  28 C.F.R. § 541.27.

Plaintiff does not dispute that, while these statutory and policy provisions establish an overall duty to protect BOP prisoners from harm, they did not require USP-Tucson staff to follow a specific course of action in response to the facts presented here—whether that would have meant placing Plaintiff back in the SHU for her own protection or immediately returning prisoner Cruze to the SHU, where he would have been less able to direct other prisoners to harm Plaintiff.  Plaintiff argues, however, that other policies and regulations— including the "SIS Manual"[8] and the BOP's policy governing PREA investigations—do establish mandates that USP-Tucson staff failed to follow in her case.  (Doc. 119 at 2−3.)

As quoted in Plaintiff's Response, the SIS Manual states:

> Confidential Information is a primary means of gathering intelligence.  The sensitivity inherent in this investigative tool mandates that staff protect the identity of the source.  The failure to do so could pose a serious threat not only of the informant, but to the security of the institution . . . should the inmate be injured as a result of staff failure to protect the informant.  If the identity of the confidential source is compromised, immediate action shall be taken to protect the individual.

(Doc. 119 at 3.)

While this provision affirms that BOP officials have a duty or "mandate" to protect the identity of prisoner informants and to take "immediate action" if the identity of a

---

[8] Plaintiff quoted the SIS Manual in her declaration and Response but did not attach a copy of this Manual or cite to it anywhere in the record.  Because Plaintiff could produce such evidence at trial, and Defendant does not dispute that the excerpt she quotes is accurate, the Court will consider this evidence.  *See Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial . . . ."); *see also Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).

prisoner informant is compromised, it notably does not set forth any specific actions BOP officials must take to safeguard the identity of prisoner informants or prescribe what "immediate action" they must take when a prisoner informant's identity becomes known. This policy, then, is no different from the federal statutes and policies already discussed, which afford prison officials a degree of discretion in how to go about protecting prisoners.[9] What is more, Plaintiff did not allege in her Complaint and has not cited to any evidence in her Response that USP-Tucson staff failed to protect her identity as a confidential source or had any reason to know prior to her alleged assault by prisoner Dugard that prisoner Cruze knew she had informed staff of Cruze's alleged threats and illegal drug activities. Absent any such showing, this provision simply does not apply.

Plaintiff also relies on 28 C.F.R. § 115.67 and BOP Program Statement 5324.12, which require the BOP to protect from retaliation any prisoners or staff who report sexual abuse, which she argues shows that USP-Tucson staff "did not have discretion whether or not to protect Plaintiff." (Doc. 119 at 3.)  This argument is misplaced because, while it is undisputed BOP officials have a non-discretionary duty to protect prisoners, Plaintiff does not identify any mandated course of action prison staff must take to fulfill this duty.

28 C.F.R. § 115.67 only specifically mandates that the BOP "establish a policy to protect all inmates and staff who report sexual abuse" and that, "[f]or at least 90 days following a report of sexual abuse, the agency shall monitor the conduct and treatment of inmates or staff who reported the sexual abuse" for signs of possible retaliation. 28 C.F.R. § 115.67(a) & (c).  As to the first requirement, Plaintiff does not dispute that Program

---

[9] Plaintiff cites to *Bistrian v. Levi*, which considered the same BOP Manual excerpt and concluded, as the Court does here, that "the manual involves elements of judgment or choice by affording prison officials with discretion to determine how to protect informants from inmate violence, just as all inmates must be so protected.  Such judgment or choice is the sort that the discretionary function exception was designed to protect. 299 F. Supp. 3d 686, 713 (E.D. Pa.), *rev'd in part on other grounds,* 912 F.3d 79 (3d Cir. 2018). Although *Bistriani* did find that prison staff had a non-discretionary duty under then-existing prison policy to account for and dispose of all razors used by prisoners during showers, this does not help Plaintiff because no such policy is at issue here.

Statement 5324.12,[10] which mirrors § 115.67, establishes a policy to protect prisoner informants who report sexual abuse. As to the second requirement, Plaintiff has not alleged or cited to any evidence that USP-Tucson did not implement a 90-day monitoring period after she made her PREA complaint. Moreover, apart from the specificity of the 90-day timeframe, neither § 115.67 nor Program Statement 5324.12 set forth a particular course of action prison officials must follow for prisoner monitoring and protection. As to monitoring, § 115.67 states that, in the case of prisoner informants, the BOP must perform "periodic status checks," to look for "changes that may suggest possible retaliation," and must "act promptly" to remedy anything "that may suggest possible retaliation." 28 C.F.R. § 115.67(c) & (d). As to protection, it requires that prison officials "employ multiple protection measures, such as housing changes or transfers for inmate victims or abusers, removal of alleged staff or inmate abusers from contact with victims, and emotional support services for inmates and staff who fear retaliation." *Id.* § 115.67(b). As with the provisions already discussed, when and how to perform status checks, what may suggest possible retaliation, and what protective measures best address a particular risk or threat all involve "an element of judgment or choice" on the part of prison staff and fall squarely within the discretionary function exception. *Green*, 630 F.3d at 1250.

Based on the above, the first prong of the discretionary function exception is met.

**2.     Whether the Actions Taken Implicate Public Policy Considerations**

The Supreme Court has found that "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert*, 499 U.S. at 324.

That presumption applies here because the statutes, regulations, and policies discussed herein embody specific public policy concerns, including the "protection,

---

[10] This policy is publicly available online at https://www.bop.gov/policy/progstat/5324_012.pdf (last visited August 11, 2022).

- 12 -

instruction, and discipline" of federal prisoners, 18 U.S.C. § 4042(a)(1), and security and law enforcement issues such as SHU placement and PREA responses, all of which implicate public policy. Following *Gaubert*, the Ninth Circuit has also found in the prison context that "[w]hen a statute, regulation, or agency guideline allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Alfrey v. United States*, 276 F.3d 557, 562 (9th Cir. 2002) (internal citations omitted).

Plaintiff argues that Defendant "failed to provide any competent evidence that an actual employee, made an actual decision, grounded in actual policy." (Doc. 119 at 4.) But this is not the proper test because, for purposes of the discretionary function exception, "[t]he focus of the inquiry is not on the agent's subjective intent . . . but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991).

In *Alfrey*, the Ninth Circuit found that, even "independent of any presumption," prison officials' choices in how to respond to a prisoner-on-prisoner threat are the kind of policy-laden decisions protected by the discretionary function exception, reasoning that "to decide what steps to take in response to a reported threat, an officer must set priorities among all extant risks: the risk presented by the reported threat, along with the other risks that inevitably arise in a prison." 276 F.3d at 565.

Plaintiff argues that *Alfrey* does not support the discretionary function exception here, noting that the Ninth Circuit did not find in *Alfrey* that the discretionary function assumption applied in "all cases where a threat of harm [to a prisoner] is involved." (Doc. 119 at 5.) *Alfrey* involved prison staff's alleged failure to protect a federal prisoner, Thomas Alfrey, from harm after Alfrey reported a threat from his cellmate, who later strangled him in their shared cell. 276 F.3d at 560. As Plaintiff points out, the Ninth Circuit found a question of fact whether, under existing regulations, the prison had a non-discretionary duty to conduct a "CIM evaluation" of Alfrey's cellmate before determining his housing assignment, which may have kept him from housing with and threatening

Alfrey. *Id.* at 562−63. But the court also found that prison staff had not violated any non-discretionary duties after they learned of the alleged threat, when they conducted a cell search but failed to find a make-shift rope, because, under the applicable regulations, prison staff "had discretion to choose how to respond to a reported threat" and the "regulations that govern cell searches confirm that the choice of the appropriate manner in which to search a cell is left to the discretion of the individual corrections officer." *Id.* at 565.

This same principle applies here where Plaintiff's FTCA claim is based on USP-Tucson staff's alleged negligence in waiting up to two hours to place prisoner Cruze in the SHU instead of immediately doing so after Plaintiff spoke to SIS Cristinzio about him—an action that clearly falls within the discretion of prison staff and implicates public policy concerns. *See id.* at 564−65 ("it is clear that balancing the need to provide inmate security with the rights of inmates to circulate and socialize within the prison involves considerations based upon public policy.") (quoting *Calderon*, 123 F.3d at 951). It is well established that, with respect to security and safety issues, prison officials are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

Although Plaintiff also argues that *Alfrey* did not involve the SIS Manual or PREA policies and relied on different regulations than the ones that apply here, this does not mean that *Alfrey*'s reasoning does not apply. The precise statutes, regulations, and policies at issue are not material to whether the discretionary function exception applies. What matters is whether "the government actor retained an element of judgment or choice with respect to carrying out the challenged action," *Green*, 630 F.3d at 1249, which the Court has already found is true here. Because of this, there is also a "strong presumption" that USP-Tucson staff's actions in this case were grounded in policy considerations, *Gaubert*, 499 U.S. at 324; *Alfrey*, 276 F.3d at 562, and Plaintiff's arguments based on discrete factual or regulatory differences between this case and *Alfrey* fail to rebut that presumption.[11]

---

[11] Plaintiff also cites to district court cases from the Seventh Circuit to try to discredit

Based on the above, both prongs of the discretionary function exception are met, and the Court will dismiss Plaintiff's FTCA claim in Count One for lack of subject matter jurisdiction.

### III. Count Two

#### A. Facts

On January 17, 2020, prisoner Oberfeldt assaulted Plaintiff on the soccer field. (DSOF ¶ 29.) Plaintiff was brought to the prison medical clinic with reports from bystanders that she had been knocked unconscious and complaints of a headache and sore face, with pain at a level of 10 out of 10. (DSOF ¶ 30; Doc. 105 at 12.) She was sent to the Emergency Room ("ER") to rule out facial fractures due to "assault/blunt trauma to face and head with loss of consciousness." (DSOF ¶ 30; PSOF ¶ 30; Doc. 105 at 14.)

Records from imaging done at the ER showed "no facial fracture or significant intracranial abnormality." (DSOF ¶ 31; Doc. 105 at 33.) Plaintiff was given Tylenol, Toradal, and Zofran for contusions and tenderness across her face and scalp and discharged with educational handouts and told to follow up with prison medical; no prescriptions were ordered, and ER staff did not indicate that Plaintiff needed to be admitted or medically monitored. (DSOF ¶¶ 32−34; Doc. 105 at 33.) The handouts stated, in part, that "[a]fter a head injury . . . most problems occur within the first 24 hours, but side effects may occur up to 7−10 days after the injury. It is important to watch your condition for any changes." (PSOF ¶ 34; Doc. 120-1 at 9.) "General Instructions" in the handouts included taking over-the-counter or prescription medications "only as told by your health care provider" and to "[h]ave someone stay with you for 24 hours after your head injury. This person should watch you for any changes in your symptoms and be ready to seek medical help, as needed." (PSOF ¶ 34; Doc. 120-1 at 11.)

---

*Alfrey*'s reliance on *Calderon*, which do not have any precedential value here and do not impact the Court's discretionary function analysis. (Doc. 119 at 5−7.) She also discusses facts and caselaw regarding LGBTQI prisoners that are immaterial to the discretionary function exception, and she presents new allegations and legal theories that go beyond the FTCA claims alleged her Complaint. (*Id.* at 7−13.) These arguments are all irrelevant to whether the Court has jurisdiction over Plaintiff's FTCA claim in Count One.

Plaintiff returned from the ER to USP-Tucson at 8:10 p.m. on January 17, 2020. (DSOF ¶36.) The pill line had closed 5 minutes before, but SHU prisoners may purchase ibuprofen from the commissary, and Plaintiff was aware she could do so. (*Id.* ¶¶ 37−39.) Plaintiff did not ask her cellmate, an adult with whom she was continually celled, to check on her. (*Id.* ¶ 42.)

On January 18, 2020, the day after she was assaulted, Plaintiff spoke with a prison volunteer, Dorothy Chao, on a recorded visit, and she told Chao about her assault and said her nose was not broken, but the center part inside was painful and swollen to the point she could not breathe through her nose. (DSOF ¶¶ 43−44; Doc. 100-3 at 20−22.) She did not complain of having a concussion, any symptoms of a concussion, or that she was being deprived of medical care or pain medication. (DSOF ¶ 45.)

On January 24, 2020, Plaintiff requested a refill of calcium polycarbophil for constipation, which was provided. (*Id.* ¶¶ 47−48.) On January 29, 2020, Plaintiff's cellmate purchased ibuprofen from the commissary, and Plaintiff purchased Halls SF Honey Lemon, a legal envelope, and allergy tablets. (*Id.* ¶¶ 40−41.)[12] Plaintiff's prison medical records do not show she requested pain medication from medical staff during the two weeks following her January 17, 2020 assault. (DSOF ¶ 46.)[13]

---

[12] Plaintiff does not dispute that her commissary receipt from that day shows only these items, but she claims that her "commissary list included a bottle of ibuprofen, but it was not sold to Plaintiff." (DSOF ¶ 41.) In support, she cites to her declaration, in which she baldly states, "At no time on, or after 1-17-2020 for a least 14 days, was I provided access to over the counter [sic] medication by the Health Services Staff nor Commissary staff for my pain. I requested and it was not provided." (Doc. 120-1 at 2 (Pl. Decl. ¶ 9).) Absent any facts about when and to whom she made these requests, these statements are too conclusory to create a genuine issue of material fact that Plaintiff requested ibuprofen and it was denied. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment"); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact"); *see also Anderson*, 477 U.S. at 250 (for a dispute to be genuine, the evidence must be such that a reasonable jury could return a verdict for the nonmovant).

[13] Plaintiff does not dispute that her medical records do not show any requests for ibuprofen, but she denies they are accurate. (PSOF ¶ 46.) In support, she cites to her declaration in which she states that she "sought such medication from Nurses at the daily pill line." (Doc. 120-1 at 2 (Pl. Decl. ¶ 10).) The attachments she cites do not show this

### B.     FTCA/Medical Negligence Standards

The FTCA authorizes damages claims against the United States for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . ." 28 U.S.C. § 1346(b)(1); *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218 (2008). Under the Act, the government may be held liable for negligence "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Liability is determined by the "law of the place" where the negligent act or omission occurred. 28 U.S.C. § 1346(b)(1).

In Arizona, a plaintiff who brings a medical malpractice claim against a healthcare provider must show that (1) the provider failed to follow the accepted standard of care for members of his profession and class, and (2) this failure proximately caused the plaintiff's injury. Ariz. Rev. Stat. § 12-563; *Preston v. Amadei*, 357 P.3d 159, 164 (Ariz. App. 2015), *review denied* (Feb. 9, 2016). In addition, Arizona Revised Statute § 12-2603 requires that the plaintiff certify whether expert opinion testimony is needed to establish the provider's standard of care and liability, and, if it is, to serve a "preliminary expert opinion affidavit" with its initial disclosures. Ariz. Rev. Stat. § 12-2603(A), (B). "An exception to the general rule requiring the use of expert medical testimony occurs where 'the negligence is so grossly apparent that a layman would have no difficulty in recognizing it.'" *Peacock v. Samaritan Health Serv.*, 765 P.2d 525, 528 (Ariz. App. 1988) (internal citations omitted); *see also Evans v. Bernhard*, 533 P.2d 721, 724 (Ariz. App. 1975) ("The medical standard of care must be established by expert medical testimony unless the conduct complained of is readily ascertainable by a layman.")

### C.     Discussion

Defendant argues that Plaintiff's FTCA claim based on medical malpractice in Count Two fails as a matter of law because Plaintiff has never disclosed a medical expert and therefore cannot prove the first element of her underlying medical malpractice claim—

---

and only support that, when she was first evaluated after her assault on January 17, 2020, she complained of 10-level pain, after which she was sent to the ER. (Doc. 120-1 at 17.)

1  that any BOP medical staff violated the standard of care for a like Arizona healthcare
2  provider in the same or similar circumstances. (Doc. 99 at 13.) Defendant further argues
3  that Plaintiff cannot show a breach of medical care based on her allegations that she did
4  not receive proper pain medication following her assault because the ER staff did not
5  prescribe any prescription medication, and Plaintiff had access to over-the-counter pain
6  medication if she needed it. (*Id.*)

7  In her Response, Plaintiff appears to argue that expert medical testimony is not
8  needed to establish a breach of the standard of care because the medical negligence in her
9  case is obvious, arguing that "the standard of care in this case is not complex." (Doc. 119
10 at 15−16.) Put simply, the crux of her claim is that, after she was examined in the ER,
11 USP-Tucson "[s]taff did not observe Plaintiff or provide medication for her pain and
12 suffering." (*Id.* at 16−17.) Contrary to Defendant's argument, a lay person could
13 determine that a medical provider's failure to provide even the most basic relief for
14 commonly recognized symptoms, such as pain, nausea, and vomiting—as Plaintiff alleges
15 in her First Amended Complaint—amounts to a breach of medical care so "obvious" that
16 expert medical testimony is not required. Plaintiff has not alleged any complicated injuries
17 beyond continued pain and suffering that would make it necessary for an expert to establish
18 either breach or causation, and the failure to provide medical expert testimony in this
19 instance is not fatal to Plaintiff's FTCA claim.

20 Plaintiff's underlying medical malpractice claim nevertheless fails for a different
21 reason. Although Plaintiff alleges in her First Amended Complaint that she "suffered in
22 intense pain for 2 weeks, with nausea and vomiting for a concussion that went untreated
23 [and] was never seen by a medical doctor" to follow up on her ER visit (Doc. 15 at 4), there
24 is no evidence that any medical provider was ever made aware of these alleged symptoms
25 and refused to address them. Plaintiff only specifically alleges that, after her ER visit on
26 January 17, 2020, Nurse Schuler yelled at her for asking for pain medication when
27 escorting her back to the SHU, and she "was never supplied pain medications from Schuler
28 or any other medical staff." But even finding in Plaintiff's favor that Schuler's hostile

response breached the duty of care for a prison nurse, Plaintiff's allegations are too conclusory to show any causal connection between Schuler's response and any alleged injuries. The record evidence shows that Plaintiff received Tylenol, Toradal, and Zofran at the ER that very night, and although she arrived back at the SHU after the pill line had already closed, she had access to over-the-counter pain relief medications at the commissary. Also, although the ER staff gave Plaintiff educational materials that instructed her to take prescribed and over-the-counter medications "as told by your health care provider," and these materials also recommended monitoring by another adult for the first 24 hours after a head injury, the ER staff did not prescribe any medications or call for any medical monitoring; nor was Plaintiff left alone for the first 24 hours. Instead, she was placed in a cell with a cellmate, whom she did not request to monitor her, and there is no evidence her cellmate or any other prisoners or staff ever observed in the first 24 hours or over the next two weeks that she was in pain, nauseated, or vomiting.

A reasonable jury could not conclude on these facts that Schuler's initial antagonistic response to Plaintiff when she returned from the ER prevented Plaintiff from obtaining appropriate pain medication and was therefore the proximate cause of any claimed injuries. Nor is there any evidence that Plaintiff suffered from any pain or other medical issues thereafter that prison staff were made aware of but failed to address. Moreover, the record shows that Plaintiff was able to request medication for constipation, which she received, and was able to make purchases from the commissary, including cough drops and allergy medication. To the extent Plaintiff argues that she made requests for pain medication at the pill line or in her "commissary list," and these were not provided, her allegations are wholly lacking in any specific facts—such as when and to whom she made these requests—and are not supported by any other evidence in the record to create a genuine issue of material fact that any medical staff refused to provide proper, medically indicated care after being made aware that Plaintiff was suffering ongoing symptoms from her assault.

Because Plaintiff cannot show any breach of proper medical care beyond Nurse Schuler's initial refusal to give her pain medication after she returned from the ER, and she cannot show that this refusal resulted in her being unable to obtain over-the-counter pain medication or prevented her from requesting additional care, as needed, she cannot show causation, and her underlying medical negligence claim fails as a matter of law. Accordingly, the Court will dismiss Plaintiff's FTCA claim in Count two.

**IT IS ORDERED** that Defendant United States of America's Motion for Summary Judgment (Doc. 99) is **granted**, and the action is **terminated with prejudice**. The Clerk of Court must enter judgment accordingly and close this case.

Dated this 22nd day of August, 2022.

_____
Honorable Rosemary Márquez
United States District Judge